UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

GREGORY SHEA, on behalf of          )
Himself and All Others Similarly    )   Case No. 1:07-CV-11384 (JLT)
Situated,                           )
          PLAINTIFF,            )
                                    )
                                    )
v.                                  )
                                    )
UNITED PARCEL SERVICE, INC.         )
                                    )
        Defendant.               )

## DEFENDANT'S OPPOSITION TO
## PLAINTIFF'S MOTION FOR REMAND

Gregory Shea has sued United Parcel Service, Inc. ("UPS"), alleging that UPS failed to pay him, and other employees like him, all wages earned by them for the work they performed as UPS employees. Mr. Shea, and all the putative class members, were represented for purposes of collective bargaining by the Teamsters Union, which, during the entire time period that is the subject of this complaint, had a collective bargaining agreement with UPS that governed the wages, hours and other terms and conditions of employment of Mr. Shea and his similarly situated co-workers.

Mr. Shea purports to bring his lawsuit under a Massachusetts state law that requires employers to pay an employee "all wages earned by him" within six days of the end of a particular pay period. M.G.L. c. 149 §148; Complaint, par. 1, 9. Mr. Shea's complaint does not allege that UPS missed the six day time deadline – rather it alleges that UPS failed in three specifically alleged ways to pay "all wages earned by" Mr. Shea and others. There is no allegation in the Complaint that UPS violated any statutory minimum wage or overtime provision. Thus, the only source of an obligation on the part

of UPS to pay wages is the collective bargaining agreement.  If UPS paid all the wages that were earned by Mr. Shea under the terms of the collective bargaining agreement, there can be no claim that UPS violated M.G.L. c. 149 § 148.  Conversely, only by demonstrating that UPS violated the collective bargaining agreement can Mr. Shea prove that UPS did not pay "all wages earned by him."  Thus, under relevant Supreme Court and First Circuit precedent, this claim is in reality a claim for breach of a collective bargaining agreement and thus arises under Section 301 of the Labor Management Relations Act and is subject to removal to federal court.  Relatedly, this matter relies for its resolution on the interpretation of the collective bargaining agreement and is thus subject to removal on federal preemption grounds.

Finally, this matter is subject to removal under the Class Action Fairness Act ("CAFA").  Mr. Shea asserts that removal under CAFA is improper because UPS has not proven that there is $5 million in dispute.  While UPS asserts, and is prepared to show, that it owes nothing to Mr. Shea or any class members, it is the allegations of the plaintiff's complaint that control what is "at issue" for purposes of CAFA and removal is thus proper.

I.  **ALADDIN THE PLAINTIFF PLEADED A STATE LAW CAUSE OF ACTION SECTION 301 PREEMPTS THE PLAINTIFF'S CLAIM PURSUANT TO THE "COMPLETE PREEMPTION DOCTRINE."**

In his Motion to Remand, Mr. Shea does not challenge the assertion that he was covered by the collective bargaining agreement at issue.  Mr. Shea's attorneys instead contend that because the Complaint does not specifically assert a breach of the collective bargaining agreement removal was improper.  This contention is incorrect.  Section 301 expressly grants district courts jurisdiction over "suits for violation of contracts between

an employer and a labor organization representing employees . . . ." 29 U.S.C. § 185(a).

As interpreted by the United States Supreme Court, "Section 301 governs claims founded

directly on rights created by collective-bargaining agreements, and also claims

substantially dependent on any analysis of a collective bargaining agreement."

Caterpillar, Inc. v. Williams, 482 U.S. 386, 395 (1987) (internal citations and quotation

marks omitted).

Even when a plaintiff pleads only state law causes of action, under the "complete

preemption doctrine," courts recognize that the preemptive force of certain statutes is "so

extraordinary that it converts an ordinary common law complaint into one stating a

federal claim for purposes of the well-pleaded complaint rule." Id. at 393. Decades of

United States Supreme Court precedent establish that Section 301 is such a statute. See,

e.g., Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 418 (1988); Teamsters

Local 174 v. Lucas Flour Co., 369 U.S. 95, 103 (1962); see also, Fant v. New England

Power Serv. Co., 239 F.3d 8, 14 (1st Cir. 2001) ("Fant does not assert a claim under

[Section 301]. Indeed, he disavows one. Nevertheless, his state law claim is tantamount

to a hybrid cause of action governed by Section 301 . . . ."). Therefore, regardless of

whether a plaintiff pleads only a state law cause of action, when, as here, a plaintiff has

pleaded what are in substance Section 301 claims, a defendant may properly remove the

action to federal court.

The United States Supreme Court has affirmed the reason for this sound policy:

> If the policies that animate § 301 are to be given their
> proper range [ ] the pre-emptive effect of § 301 must
> extend beyond suits alleging contract violations. . . The
> interests in interpretive uniformity and predictability that
> require that labor-contract disputes be resolved by
> reference to federal law also require that the meaning given

974314-1

> a contract phrase or term be subject to uniform federal interpretation. *Thus, questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law . . . . "*

Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 211 (1985) (emphasis added).

Here, Mr. Shea and his attorneys claim that the UPS failed to pay some of the wages that he earned. The collective bargaining agreement is the only source of determining what was and was not earned, and, thus Mr. Shea is claiming that UPS breached its duty under the collective bargaining agreement. Further, the state law wage claim that the Plaintiff asserts will require the court to interpret the relevant provisions of the collective bargaining agreement. Thus, removal of this action to federal court was proper.

II.   **REMOVAL WAS PROPER BECAUSE THE PLAINTIFF'S CLAIM CONCERNING WHETHER OR NOT THE DEFENDANT HAD A DUTY TO PAY WAGES IS A QUESTION OF WHETHER OR NOT THE DEFENDANT BREACHED ITS DUTY UNDER THE CBA.**

The First Circuit has identified two ways in which a state law claim can depend on a collective bargaining agreement for preemption purposes. George v. AT&T Corp., 2006 U.S. Dist. LEXIS 43289, * 15 (June 23, 2006) (citing Flibotte v. Pennsylvania Truck Lines, Inc., 131 F.3d 21, 26 (1st Cir. 1997)). Labor law preemption "casts a relatively wide net." Flibotte, 131 F.3d at 26. A state law claim can depend upon the meaning of a collective bargaining agreement in either of one of two distinct ways. First, a claim can allege the violation of a duty that arises from the collective bargaining agreement itself. Id. Second, a claim depends on the meaning of a collective bargaining agreement if the resolution of the claim "arguably hinges" upon the interpretation of the

-4-

collective bargaining agreement. Id. If a state law claim depends on the meaning of either of these ways it is preempted. Id.

The Plaintiff's claim definitely depends upon the meaning of the collective bargaining agreement under the first test. Here, the Plaintiff claims that the Defendant did not pay all wages that were due on a weekly basis, as required by statute, M.G.L. c. 149, § 148. (Complaint ¶ 1). The Plaintiff does not claim that wages were not paid on a weekly basis, but that the Defendant failed to pay, at any given time, some of the wages that were due. There is no claim that the Defendant violated minimum wage laws by paying less than statutory minimum wages, nor is there a claim that the Defendant violated statutory laws.

Therefore, the only way there can be a failure to pay wages that were due is if the Defendant failed to pay the wages it had promised to pay the Plaintiff. The only promises that the Defendant made to the Plaintiff about wages were lawfully made under the collective bargaining agreement. See Ex. B to petition for removal, pp. 63-64, 113-115, 161, 189-192. In order to prove that wages not paid were in fact due, Mr. Shea must demonstrate that the wages were required under the collective bargaining agreement; if there was no breach of the collective bargaining agreement, there was no violation of M.G.L. c. 149 § 148. Thus, this case is about whether or not the Defendant had a duty to pay certain wages under the collective bargaining agreement and whether or not the Defendant breached that duty. Therefore, Section 301 governs this action and the Defendant properly removed this action to federal court.

974314-1

III.   **REMOVAL WAS PROPER BECAUSE THE PLAINTIFF'S ALLEGATION REQUIRES THE COURT TO INTERPRET SEVERAL INTERLOCKING PROVISIONS OF THE CBA.**

Moreover, resolution of this claim will require the court to interpret the terms of the collective bargaining agreement. Mr. Shea's claim concerning whether all wages earned were paid requires interpretation of the collective bargaining agreement because, without conceding liability, the duty to pay wages was a promise created by the collective bargaining agreement. Similar to Fant, Mr. Shea's entitlement to certain wages can only be resolved by referring to the terms of the collective bargaining agreement. Fant, 239 F.3d at 15.

The Plaintiff claims he earned wages that were not paid for the following: (1) five minutes per work day was not counted by UPS's time clocks; (2) periodically scheduled meetings, trainings, and testing sessions ("Sessions") before his shift; and (3) periodic reporting time in which he was required to report to work, but was not paid when informed that the employer did not need his services. (Complaint ¶¶ 5-7).

With regard to the first allegation (which UPS denies as a factual matter) the question really is when did Mr. Shea begin his work day and thus begin to earn wages under the collective bargaining agreement. Even if Mr. Shea could show that he was correct as a factual matter, he would need to show that such an arrangement violated the collective bargaining agreement in order to establish whether he was properly paid or not. Article 52 of the collective bargaining agreement, in relevant part, states the following:

> A daily time record shall be maintained by the Employer for all of his employees. Each employee shall "punch in" his own time card or badge or device at the *start of the day*, and "punch out" his own time card or badge or device at the *completion of the day's work* at the Employer's place of business.

974314-1

In order to resolve Mr. Shea's claim, the court would need to interpret the language in

Article 52 of the collective bargaining agreement

Similarly, the court will be required, at the very least, to interpret two more

Articles of the collective bargaining agreement -- Article 22 and Article 55 -- to

determine whether wages are due to the Plaintiff for sessions he attended before his shift,

and for reporting to work and not receiving some of his wages when his services were not

needed.

Article 55, in relevant part, states the following:

Part-time employees are defined as employees who, when
reporting to work as scheduled, shall receive the guarantee
provided in Article 22, Section 5(d), except for those part-time
employees scheduled to work eight (8) hours. Should any part-time
employee be required to work beyond the fifth (5th) hour he shall
be paid one and one half (1 1/2) times his regular hourly rate for
those hours worked in excess of five (5) hours on that day.

When an employee elects to accept an assignment to a second
shift, prior to the end of their regular shift this provision shall not apply.

This Article must be read in conjunction with Article 22, Section 5(d) which states the

following: "[a]ll part-time employees governed by the Article shall be provided a

minimum daily three and one-half (3-1/2) hour guarantee." It is quite possible that

Article 55 did not apply to the Plaintiff's circumstances and no guarantee payment was

due to the Plaintiff.

In addition to being fundamentally a claim for breach of the collective bargaining

agreement, Mr. Shea's state law claim depends on the meaning of the collective

bargaining agreement for its resolution and the Defendant's removal of this action to

federal court was proper.

-7-

IV.    **REMOVAL WAS PROPER UNDER CAFA**

In addition to the federal pre-emption removal grounds, which should be dispositive, this matter was properly removed under the Class Action Fairness Act ("CAFA") , 28 U.S.C. §1332(d)(2).  In his motion to remand, Mr. Shea attacks only one of the prongs necessary for removal under CAFA – he asserts that this purported class action is not one in which "the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs."

As noted in the Answer on file in this case and above, UPS believes that the factual allegations of Mr. Shea's claim have no basis – UPS did not set its time clock 5 minutes off, did not fail to pay Mr. Shea or others for training sessions, and did not send employees who showed up for work on time home without any compensation.  Thus, UPS' strong assertion in this case is that this matter is worth nothing.

However, when assessing whether the amount in controversy exceeds $5,000,000, the Court must look at the allegations of the Complaint.  If those allegations were to be proven despite UPS' denials, it is certainly possible that the amount recoverable would exceed $5 million.

The Complaint alleges that Mr. Shea and similarly situated employees were not paid for three categories of alleged working time (paragraphs 5, 6 & 7 of the Complaint); and (2) that Mr. Shea is representative of the purported class members (paragraphs 15 & 20 of the complaint).  While UPS denies both assertions, for purposes of the amount at issue for purposes of determining the amount in controversy, the only real missing variable is the number of positions at issue.

-8-

974314-1

As set forth in the affidavit provided to plaintiff's counsel by UPS and attached as Exhibit A to the Memorandum in Support of Motion to Remand, there are, at any given time in the class period, approximately 2791 part-time hourly employees working for UPS in Massachusetts. $5.0 million divided by 2791 positions = $1,791.47. Thus, unless Mr. Shea and his attorneys are claiming that each "position" during the class period is entitled to less than $1,791.47, then the $5 million "at issue" threshold would be reached.

If Mr. Shea is truly representative, a simple way to determine what is at issue would be to extrapolate from his individual claim. Mr. Shea worked 4.5 months (Complaint, par. 2) - that comes out to approximately 1/8 of the 3 year period being claimed under the lawsuit. Taking the $1,791.47 number calculated above and dividing it by 8 equals $223.93. Thus, if Mr. Shea's individual claim exceeds $223.93, then the amount issue for the class as a whole exceeds $5 million. Mr. Shea claims in his Complaint that UPS is liable to him and the class for "three times their unpaid compensation." (Complaint, par. 13). Thus, if the value of Mr. Shea's base wage claim is at least $74.65 (which is 1/3 of $223.93) then it is reasonable to believe that the claim of the class as a whole exceeds $5 million.

Mr. Shea alleges that UPS shorted him 5 minutes per shift. (Complaint par. 5). That comes to approximately 95 shifts (assuming 5 shift per week), or approximately 8 hours. Under Article 22, section 5 of the collective bargaining agreement, part-time employees such as Mr. Shea start at either $9.50/hour or $8.50/hour for the first 90 days. (Exhibit B to Notice of Removal, p. 64) Mr. Shea made the higher amount, as he was a pre-loader (complaint, par 2). Thus, if Mr. Shea were to prove his allegations, UPS

-9-

would have paid him $76 less than he "earned" solely on the basis of his allegation concerning the time clock being off. By itself, that is more than the $74.65 in unpaid wages needed to result in $5 million at issue (taking into account trebling).

Indeed, because Mr. Shea only worked for 95 days, he spent most of his time at a low rate of pay, compared to the scale set forth in Article 22 Section 5 of the collective bargaining agreement (Ex. B to Petition for Removal, p. 64). It is reasonable to assume that others in the purported class had a higher pay rate.

Further, Mr. Shea alleges that he was required to attend meetings and training sessions for which he was not paid. UPS has no record of such unpaid meetings or training sessions, so it cannot comment on exactly what Mr. Shea is claiming in terms of time, but if one assumes 4 meetings or sessions of 15 minutes each, that is another hour, or another $9.50 that Mr. Shea is claiming.

Moreover, the Complaint also alleges that purported class members showed up to work and were not paid. (Complaint, par. 7). Article 22, section 5 of the collective bargaining agreement provides that part-time employees "shall be provided a minimum daily three and one half (3-1/2) hour guarantee." (Ex. B to Petition for Removal, p. 64). Assuming that this happened to Mr. Shea at least once during his 95 days with UPS, this would result in an additional $33.25 in unpaid compensation ($9.50 X 3.5 hour guarantee = $33.25).

Mr. Shea of course has the ability to quantify his own claim – UPS cannot currently do so and therefore must make reasonable assumptions based on facts UPS knows and the allegations of the complaint. like those assumptions made above. Using those numbers, Mr. Shea's individual claim for unpaid wages is approximately $76.00

-10-

plus $9.50 plus $33.25, for a total of $118.75. Mr. Shea worked for 1/8 of the period at issue, so extrapolating his situation out to the full three year period yields $950 in unpaid wages owed to the hypothetical employee who worked the entire period. There were at any given time in the period approximately 2791 part time employees. If all those employees were similar to Mr. Shea, that would result in unpaid wages of $2,651,450. Mr. Shea and his attorneys in the Complaint seek trebling of the unpaid wages. (Complaint par. 13). Trebling the approximation of unpaid wages results in $7.9 million at issue in this case.

There is simply no other way for UPS to determine what amount is at issue in this case. UPS denies that it failed to pay wages to Mr. Shea, or to any class member, in the manner alleged in the complaint. It cannot, therefore, review records to determine precisely how much time was unpaid under Mr. Shea's theory. If CAFA removal is to mean anything it must be that a reasonable approximation of the amount at issue at the outset of a matter is appropriate.

### CONCLUSION

For the foregoing reasons, the Plaintiff's Motion for Remand should be denied.

UNITED PARCEL SERVICE, INC.

By its attorneys,

Hugh F. Murray, III, BBO #557175
James F. Radke, BBO #667299
Murtha Cullina LLP
99 High Street
Boston, MA 02110
617-457-4000
hmurray@murthalaw.com
jradke@murthalaw.com

-11-

974314-1

DATED:  September 12, 2007

## CERTIFICATE OF SERVICE

    I, Hugh F. Murray certify that on this 12th day of September, 2007, the foregoing document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF").

Hugh F. Murray III

974314-1
974314v1

# ATTACHMENT

LEXSEE 2006 U.S. DIST. LEXIS 43289

**BEVERLY A. GEORGE, Plaintiff, v. AT&T CORP., Defendant.**

**CIVIL ACTION NO. 05-11079-DPW**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHU-
SETTS**

*2006 U.S. Dist. LEXIS 43289; 153 Lab. Cas. (CCH) P10,708; 38 Employee Benefits
Cas. (BNA) 2316*

**June 23, 2006, Decided**

**COUNSEL:** For Beverly A. George, Plaintiff: Blake J. Godbout, LEAD ATTORNEY, Blake J. Godbout & Associates, Boston, MA.

For AT&T Corporation, Defendant: Nathan L. Kaitz, Leah Miriam Moore, LEAD ATTORNEYS, Morgan, Brown & Joy, LLP, Boston, MA.

**JUDGES:** [*1] DOUGLAS P. WOODLOCK, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** DOUGLAS P. WOODLOCK

**OPINION**

*MEMORANDUM AND ORDER*

June 23, 2006

Effective August 1, 2004, Plaintiff Beverly A. George retired as an employee of Defendant AT&T Corp. ("AT&T"), after 30 years of service. On September 13, 2004, AT&T announced a workforce reduction of 140 employees. If Plaintiff had remained in Defendant's employ through September 13, 2004, she would have been eligible to receive 100 weeks of severance pay as part of Defendant's Voluntary Termination Pay ("VTP") offer; having retired on August 1, 2004, she was not eligible. Plaintiff brings this action alleging that she was falsely induced to retire by the intentional (Count I) and negligent (Count II) misrepresentations of Defendant. Defendant moves for summary judgment.

**I. BACKGROUND**

The following facts are presented in the light most favorable to the non-moving party, here the plaintiff. *See Pacific Ins. Co., Ltd. v. Eaton Vance Management, 369 F.3d 584 (1st Cir. 2004).*

In 1970, when she was a senior in high school, Plaintiff began working for AT&T part-time in the Operator Services Department of its Walpole, Massachusetts facility. Following [*2] a two-year maternity leave, she resumed her job in the Operator Services Department in Brockton, Massachusetts in 1977. Over the next twenty years, she was transferred to AT&T facilities in Taunton, Worcester, Peabody, and Providence, Rhode Island. [1] In 1997, she was transferred to the Fairhaven Call Center in Fairhaven, Massachusetts ("Fairhaven Facility"), where she worked as a Customer Sales and Service Representative until her retirement in 2004.

> 1    Plaintiff was transferred from Brockton, Worcester and Peabody as a result of the closings of those offices. The Providence center closed after Plaintiff had moved to Fairhaven.

During her employment with AT&T, Plaintiff was a member of the Communication Workers of America ("CWA"). The terms and conditions of her employment were governed by a collective bargaining agreement ("CBA") between AT&T and the CWA.

**A. Retirement Planning**

Sometime in 2000 or 2001, Plaintiff began to contemplate retirement. However, her pension benefit was subject to reduction [*3] if she retired prior to completing 30 years of service. Her beginning net credited service date ("NCS") was July 28, 1974, so she was eligible for a full pension as of July 28, 2004.

With that date in mind, Plaintiff scheduled her 2004 vacation for the last two weeks of July with the possibility of retirement at the conclusion of her vacation. A number of factors contributed to her decision to retire, including her own health issues and those of her son. The pivotal factor in Plaintiff's retirement decision, however,

2006 U.S. Dist. LEXIS 43289, *; 153 Lab. Cas. (CCH) P10,708;
38 Employee Benefits Cas. (BNA) 2316

was the possible closing or downsizing of the Fairhaven facility. This issue was important to Plaintiff because the CBA provided that employees who volunteered for lay-off were to receive a termination payment depending on their years of service. [2] For an employee with 30 years of net credited service, the termination payment would equal 100 weeks of pay.

2   Article 25, P 1 provides:

> A termination payment, plus compensation for any vacation to which the employee is entitled at the time of leaving the Company, shall be paid to a regular employee who is laid off or may be offered by the Company to an employee as an inducement to voluntarily leave the Company.

[*4]   Plaintiff closely followed AT&T business developments looking for signs that the Fairhaven facility might downsize or close. From December 2003 through June 2004, AT&T published announcements warning employees that the expiration of various Federal Communications Commission ("FCC") regulations may negatively affect AT&T's ability to continue its operations in the consumer sector. Following a Supreme Court ruling allowing the FCC rules to expire, [3] AT&T announced the closing of its residential business in Ohio, Missouri, Washington, Tennessee, Louisiana, Arkansas, and New Hampshire in June 2004. AT&T's Annual Report to Stockholders for 2003 anticipated further workforce reductions.

3   In response to an emergency request by AT&T, MCI, and state utility regulators, Chief Justice Rehnquist without comment declined, as Circuit Justice, to stay the DC Circuit decision allowing the FCC regulations to expire. *See U.S. Telecom Ass'n v. FCC, 360 U.S. App. D.C. 202, 359 F.3d 554 (D.C. Cir. 2004).*

The Fairhaven service center [*5] opened in 1997. At its peak in the early part of 2000, it housed over 1,000 employees. By early 2004, the number had dropped to 430. Rumors of further downsizing at Fairhaven had been circulating as early as 2001. Fairhaven Consumer Sales and Services Group Manager Joan Gallagher Cappuccio wrote to all Fairhaven employees in 2001, October 2002, and April 2003, dispelling the rumors and asking employees to help quell them. [4] "just slow." Through May and June 2004, the waiting period between calls grew to about 30 minutes. [5] On a number of occasions, as

Eustace passed by Plaintiff's workstation, Plaintiff inquired about a workforce reduction or closing. Each time Eustace replied in the negative. At one point, Plaintiff suggested that Eustace "may want to warm up [her] resume." Eustace responded, "I feel pretty confident that I'll be okay."

4   The memos explicitly denied the truth of the rumors. The 2001 memo reported that Nancy Pryor, consumer Long Distance Vice President, "reassur[ed] us that there are no plans to close the center." The 2002 memo stated,

> **RUMOR**: THE CHANNEL WILL ANNOUNCE THE CLOSING OF THIS CENTER AS OF OCTOBER 2002. IS THIS TRUE?

> **RESPONSE**: NO! There are currently no plans to close the center.

In an email sent to all employees on April 24, 2003, Cappuccio wrote, "The rumors in regards to Fairhaven closing are NOT TRUE! . . . There will be NO closing announcements. If you have any information concerning the origin of this rumor please share with your managers so we can put a stop to this falsehood."

[*6]
5   The volume of calls had dropped approximately 33% between April and August 2004.

In May or early June 2004, Eustace asked Plaintiff about her retirement plans and reminded her of the need to get her paperwork in on time. Plaintiff responded that if all went well, she would retire on August 1, 2004. Eustace also asked Plaintiff to be interviewed for the Fairhaven Flyer, the company newsletter, about her retirement. Plaintiff initially declined because she had not made up her mind to retire, but she acquiesced after repeated requests.

Plaintiff requested her retirement package from AT&T's pension center on June 18, 2004, but she had still not finalized her decision to retire. Plaintiff continued to question managers about the possibility of a workforce reduction in Fairhaven. At one point in June 2004, managers from other AT&T centers arrived at Fairhaven for a sales meeting. Plaintiff thought it was odd that so many managers were there, and asked one of them if he was under disguise, trying to figure out which offices to close. He responded, "No."

Case 1:07-cv-11384-JLT   Document 8   Filed 09/12/07   Page 16 of 23

Page 3

2006 U.S. Dist. LEXIS 43289, *; 153 Lab. Cas. (CCH) P10,708;
38 Employee Benefits Cas. (BNA) 2316

In early July, Plaintiff stopped Cappuccio [*7] in the hallway. She expressed her concern about the Supreme Court decision lifting the caps on the former Baby Bells and asked if she should stay and possibly avail herself of a severance package. Cappuccio replied, "No, Bev. We're still going to be here." Cappuccio reassured Plaintiff that they were not going to close or downsize and explained that AT&T had just sold the Fairhaven building and secured a five-year lease. [6]

> 6 When the Fairhaven facility was established in 1997, AT&T owned the building and occupied three floors on one side and two floors on the other. By 2003, AT&T occupied only one third of the building. For this reason and because of difficulties with tenants, AT&T sold the building in September 2004. As part of the sale, AT&T leased back a portion of the building under a five-year lease.

After this conversation, Plaintiff decided to fill out her retirement paperwork. She submitted the documents on July 10, 2004, and the service center received them three days later. Her last day of work was [*8] July 16, 2004. She was given a luncheon that day and left on a two week paid vacation, with her retirement effective August 1, 2004.

On September 13, 2004, AT&T announced a workforce reduction of 140 employees at the Fairhaven facility and offered to provide Voluntary Termination Pay ("VTP") to those employees who volunteered to leave work. The downsizing was reported in the Standard Times, a local Fairhaven paper. Plaintiff, who is not a Fairhaven resident, learned about the downsizing sometime between August and October 2004, after speaking with former colleagues. [7] If Plaintiff had waited one month and a half to terminate her employment she would have been eligible for 100 weeks of severance pay. The VTP offer did not extend to recently retired employees.

> 7 It is not clear when Plaintiff actually learned of the downsizing. In her deposition, she states first that she learned of it through conversations with friends and a Wall Street Journal article in the summer of 2004. At a later point in her deposition and in her Affidavit she claims she did not hear about it until October 2004.

[*9] Neither Cappuccio nor anyone else at the Fairhaven site was asked for any input into the downsizing decision. Cappuccio learned of the downsizing through a phone call on September 10, 2004. In fact, she was scheduled to meet with other employees on September 15 -- two days after the downsizing announcement -- to work on the plan to build out the newly leased space for 430 employees. [8] She never contacted her supervisors

with respect to Plaintiff's questions about the status of the Fairhaven facility. She claims that downsizing is not something that she ever "considered, talked about, thought would happen."

> 8 This meeting actually occurred, but the focus shifted from planning for 430 employees to accommodating a smaller workforce.

Eustace, for her part, states that she learned of the downsizing on Monday, September 13, 2004. She testified that she knew beforehand that there would be a general restructuring announcement in September that included a reduction in management levels, but did not know any more detail.

[*10] **B. Grievance Process**

The collective bargaining agreement between AT&T and the CWA requires employees to submit grievances to the union within 60 days of the alleged incident. On November 16, 2004, Plaintiff wrote to Linda Teoli, President of CWA Local 1051, alleging that Defendant cheated her out of the opportunity to avail herself of a VTP package under Article 25 and requesting that the union file a grievance on her behalf. On December 9, 2004, Local 1051 filed a grievance claiming that AT&T violated Article 25, § 6(a), the provision of the CBA that exempts from VTP employees who leave on their own volition, without inducement by the company.

On December 14, AT&T rejected Plaintiff's grievance on the grounds that (1) it was filed after the 60-day limit and (2) the company generally does not accept grievances from retirees. Teoli wrote Plaintiff three days later, confirming that well over 60 days had passed between July 16, 2004, Plaintiff's last day of work, and the incident date reported on the grievance, and the November 16 filing date.

On December 19, 2004, Plaintiff wrote CWA Representative Bill Bates seeking to appeal the decision. She argued that she had filed [*11] a timely grievance on July 8, 2004, regarding the incorrect calculation of her pension, and because that grievance was related to her retirement, it should serve as a "spring board" to the second. On January 19, 2005, Bates replied that Plaintiff's November 16, 2004, grievance was untimely, and AT&T was correct not to accept it.

On January 24, 2005, Plaintiff wrote to CWA President Morton Bahr seeking further review. The appeal was referred to Frederick W. Cory, Headquarters Counsel. On February 14, 2005, Cory wrote that Plaintiff's November 16, 2004, grievance was untimely, and that if she wanted to pursue the separate question of an alleged incorrect pension calculation, she could do so by filing

Case 1:07-cv-11384-JLT   Document 8   Filed 09/12/07   Page 17 of 23

Page 4

2006 U.S. Dist. LEXIS 43289, *; 153 Lab. Cas. (CCH) P10,708;
38 Employee Benefits Cas. (BNA) 2316

an appeal to the company's Benefits Committee and thereafter by filing an ERISA action.

Plaintiff filed this suit on April 21, 2005, in Massachusetts Superior Court, and Defendant removed the case to federal court on the basis of diversity jurisdiction. I held a hearing on the instant motion for summary judgment on June 7, 2006. [9]

> 9 At the hearing, Plaintiff provided her counsel with several documents which she believed relevant to questions that I had raised. After a brief colloquy concerning the documents, I provided Plaintiff with the opportunity to submit the documents by way of supplemental filing no later than Friday, June 9, 2006. She did so, and on June 12, 2006, she submitted a belated second supplemental filing with two additional documents.

## [*12] II. STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c).*

Once the moving party shows that there is no genuine issue of material fact, the nonmovant must produce evidence to show that a trialworthy dispute exists. *Rathbun v. Autozone, Inc., 361 F.3d 62, 66 (1st Cir. 2004).* A fact is "material" if it has the "potential to affect the outcome of the suit under the applicable law." *Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000).* A "genuine" issue is one supported by such evidence that "a 'reasonable jury, drawing favorable inferences,' could resolve it in favor of the nonmoving party." *Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999)* (quoting *Smith v. F.W. Morse & Co., 76 F.3d 413, 428 (1st Cir. 1996)).* "[C]onclusory allegations, improbable [*13] inferences, and unsupported speculation," are insufficient to establish a genuine dispute of fact. *Velez-Rivera v. Agosto-Alicea, 437 F.3d 145, 154 (1st Cir. 2006).* In ruling on a motion for summary judgment, a court must view "the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Pacific Ins. Co., Ltd. v. Eaton Vance Management, 369 F.3d 584 (1st Cir. 2004).*

## III. DISCUSSION

Defendant argues two alternative grounds for summary judgment: first, that this action is preempted by federal law governing collective bargaining agreements; and second, that the misrepresentation claims fail on the merits. Recognizing that these alternatives provide separate and independent grounds for awarding judgment to the Defendant, I will discuss both although success on either would be sufficient to grant Defendant's motion.

## A. Preemption

AT&T contends that Plaintiff's claims are preempted by § 301 of the Labor Management Relations Act of 1947 (LMRA), *29 U.S.C. § 185.*

*Section 301* confers federal jurisdiction on "suits for violation of contracts between an employer [*14] and a labor organization representing employees in an industry affecting commerce." *29 U.S.C. § 185(a).* The Supreme Court has interpreted this language as "authoriz[ing] federal courts to fashion a body of federal law for the enforcement of . . . collective bargaining agreements." *Martin v. Shaw's Supermarkets, Inc., 105 F.3d 40, 42 (1st Cir. 1997)* (quoting *Textile Workers v. Lincoln Mills, 353 U.S. 448, 451, 77 S. Ct. 912, 1 L. Ed. 2d 972 (1957)).* This authority forms the basis for a jurisprudence of labor-law preemption, a body of law that "casts a relatively wide net." *Flibotte v. Pennsylvania Truck Lines, Inc., 131 F.3d 21, 26 (1st Cir. 1997).*

*Section 301* preempts a state-law claim "if the resolution of [that] claim depends on the meaning of a collective bargaining agreement." *Id.* (quoting *Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 405-406, 108 S. Ct. 1877, 100 L. Ed. 2d 410 (1988)).* Accordingly, purely factual questions about an employee's conduct or an employer's motives escape preemption. *Id.* So too litigation that refers to a collective bargaining agreement merely in passing. *Martin, 105 F.3d at 42.* In practice, [*15] the test for preemption under § 301 "boils down to whether a state-law claim plausibly can be said to depend upon the meaning of one or more provisions within the collective bargaining agreement." *Flibotte, 131 F.3d at 26.*

The First Circuit has identified two ways in which a state-law claim can "depend" on a collective bargaining agreement for preemption purposes. *Id.* First, it can allege the violation of a duty that arises from the collective bargaining agreement itself. *Id.* (citing *United Steelworkers v. Rawson, 495 U.S. 362, 369, 110 S. Ct. 1904, 109 L. Ed. 2d 362 (1990)).* A claim can survive this "Rawson-based" preemption, only if the defendant acted "in a way that might violate the duty of reasonable care owed to every person in society." *Rawson, 495 U.S. at 371.* Second, it can qualify for preemption if it requires a court to interpret a specific provision of the collective bargaining agreement. *Id.* (citing *Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 220, 105 S. Ct. 1904, 85 L. Ed. 2d 206 (1985)).* "This means a *real* interpretive dispute and not merely a pretended dispute." *Martin, 105 F.3d at 42*

Case 1:07-cv-11384-JLT   Document 8   Filed 09/12/07   Page 18 of 23

Page 5

2006 U.S. Dist. LEXIS 43289, *; 153 Lab. Cas. (CCH) P10,708;
38 Employee Benefits Cas. (BNA) 2316

(emphasis in original). Put differently, "the bare [*16] fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." *Lydon v. Boston Sand & Gravel Co.,* 175 F.3d 6, 10 (1st Cir. 1999) (quoting *Livadas v. Bradshaw,* 512 U.S. 107, 124, 114 S. Ct. 2068, 129 L. Ed. 2d 93 (1994).

Plaintiff brings this suit based on the state-law theories of intentional and negligent misrepresentation. She has alleged that AT&T managers, specifically Eustace and Cappuccio, misrepresented the status of the Fairhaven facility when they told Plaintiff in June and July 2004 that there were no plans to downsize or close. Plaintiff contends that resolution of these claims does not depend on the CBA because (1) no provision of the CBA directly applies and (2) there is no dispute as to the interpretation Article 25, the only relevant provision of the CBA. She claims that the parties agree that Article 25, P 1 would have entitled Plaintiff to 100 weeks of VTP, if she had been employed in September 2004.

AT&T, for its part, contends that Article 25 is indeed in dispute. It styles the debate as a question of interpretation, not of P 1, but of P 6(a), which excludes from VTP eligibility [*17] employees who leave the company "voluntarily without inducement." In Defendant's view, Plaintiff is claiming that she did not leave the company voluntarily, but rather was wrongfully induced to leave by Defendant's alleged misrepresentations. And this, AT&T claims, is a matter to be resolved through the CBA's grievance and arbitration procedure.

This case presents an analytical challenge because it falls in the middle of the § 301 preemption spectrum. *See Paradis v. United Technologies, Pratt & Whitney Division,* 672 F. Supp. 67, 69 (D. Conn. 1987). At one end of this spectrum are those claims, such as unjust termination of an employee covered by a just termination clause, that are closely linked to a collective bargaining agreement. *Id.* At the other end are claims, such as physical assault by an employer, that are wholly unrelated to the collective bargaining agreement. *Id.* In between is a significant gray area.

To illustrate, consider *Lueck,* 471 U.S. 202, 105 S. Ct. 1904, 85 L. Ed. 2d 206, the case in which the Supreme Court first held that § 301 preemption extended beyond breach of contract to tort actions. In *Lueck,* the plaintiff suffered a back injury and filed a [*18] disability claim with Aetna in accordance with the collective bargaining agreement between his employer, Allis-Chalmers, and his union. The plaintiff alleged that Allis-Chalmers was harassing him by failing to pay his benefits on time and requiring multiple doctor visits. Instead of using the grievance process outlined in the collective

bargaining agreement, he filed suit under Wisconsin tort law for the bad-faith handling of an insurance claim.

The Supreme Court held that Lueck's claim was preempted by § 301 because it could not be resolved without interpreting the scope of the right to disability payments under the collective bargaining agreement. *Id.* at 215. Writing for a unanimous court, [10] Justice Blackmun explained that the "interests in interpretive uniformity and predictability" required that labor-contract disputes be resolved by reference to federal law. *Id.* at 211. Thus, the Court concluded that

> questions relating to what the parties to a labor agreement agreed, and what legal consequence were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in [*19] the context of a suit for breach of contract or in a suit alleging liability in tort. Any other result would elevate form over substance and allow parties to evade the requirements of § 301 by relabeling their contract claims as claims for tortuous breach of contract.

*Id.*

10   The *Lueck* court consisted of eight justices; Justice Powell did not participate.

Whereas *Lueck* cast the net of § 301 preemption broadly, *Rand v. Bath Iron Works Corp.,* 2001 U.S. Dist. LEXIS 23164, 2001 WL 127655 (D. Me. Feb. 15, 2001), relied upon by Plaintiff, identifies its limits. In Rand, Bath Iron Works ("BIW"), a union shop, wanted to hire approximately 100 skilled pipe fitters and electricians for a short term project and then discharge them once the project was completed. 2001 U.S. Dist. LEXIS 23164, [WL] at *2. Anticipating that it would be difficult to attract short term workers, BIW advertised the positions as long term with no risk of lay off in the near future. *Id.* Because new workers were not covered by the collective bargaining agreement's [*20] "no layoff" clause, BIW recruiters gave new hires repeated assurances of job security. 2001 U.S. Dist. LEXIS 23164, [WL] at *3. BIW successfully concealed the nature of the job, hired over 100 employees, and discharged them with one day's notice once the project had been completed. *Id.*

The discharged employees brought suit asserting state-law claims of fraud, negligent misrepresentation, and breach of contract. In a Report and Recommendation, Magistrate Judge Cohen recommended against preemption. He rejected BIW's arguments that the no-layoff

Case 1:07-cv-11384-JLT   Document 8   Filed 09/12/07   Page 19 of 23

Page 6

2006 U.S. Dist. LEXIS 43289, *; 153 Lab. Cas. (CCH) P10,708;
38 Employee Benefits Cas. (BNA) 2316

provision provided the basis for plaintiff's claim and that the wage and benefit provisions of the CBA were essential to showing damages, finding instead that plaintiffs were asserting rights independent of the contract. *2001 U.S. Dist. LEXIS 23164, [WL] at *6*. He concluded that the conflict in the case arose "not from the prospect of differential interpretation of CBA terms but from the nullifying conduct of [BIW's] own agents in the hiring process, a type of conflict that *section 301* preemption was not designed to avoid." *2001 U.S. Dist. LEXIS 23164, [WL] at *7*. [11]

11  As Magistrate Judge Cohen noted, *Rand v. Bath Iron Works, Corp., 2001 U.S. Dist. LEXIS 23164, 2001 WL 127655, *4 (D.Me. Feb. 16, 2001)*, plaintiffs in *Rand* earlier brought a separate action under the name "BIW Deceived" against the union arising from the same nucleus of operative facts. *BIW Deceived v. Local S6, Indus. Union of Marine and Shipbuilding Workers of Am., 132 F.3d 824 (1st Cir. 1997)*. In that case, the First Circuit affirmed the district court's denial of the plaintiff's motion to remand in part on the ground that *§ 301* "arguably preempted" the plaintiff's negligence claim against the union, thus presenting a colorable federal question. *Id. at 833*. The First Circuit in *BIW Deceived*, however, did not finally determine the question of preemption in the context of this BIW dispute.

Judge Carter adopted Magistrate Judge Cohen's Report and Recommendation, and ultimately remanded the case to state court. *See Rand v. Bath Iron Works*, Civ. Action No. 99-00227, Order Affirming Recommended Decision of Magistrate Judge Cohen (April 2, 2001); Order Remanding Case to the Maine Superior Court (June 5, 2001).

[*21]  This case is similar to *Lueck* in that the VTP benefit that Plaintiff would have had but for AT&T's allegedly fraudulent conduct derived from the CBA and was regulated by the CBA. On the other hand, this case also has features similar to *Rand* in that the claim of misrepresentation is, at least in theory, independent of the underlying contract; the tort is the deception itself -- here, the alleged misrepresentations by Eustace and Cappuccio that AT&T had no plans to close or downsize the Fairhaven facility. *See Anderson v. Ford Motor Co., 803 F.2d. 953, 957 (8th Cir. 1986)* (distinguishing *Lueck* and finding plaintiff's claims of fraudulent misrepresentation not preempted by *§ 301*).

Cases within this gray area have fallen on both sides of the preemption line with respect to misrepresentation claims. One distinction that can be drawn, however, is that courts finding against preemption tend to do so in situations in which the alleged misrepresentations took place before the plaintiffs had been hired. *See e.g., Rand, 2001 U.S. Dist. LEXIS 23164, 2001 WL 127655 at *6; Anderson, 803 F.2d at 957-58; Belknap, Inc. v. Hale, 463 U.S. 491, 494-97, 103 S. Ct. 3172, 77 L. Ed. 2d 798 (1983)*; [*22]  *but see Bale v. General Telephone Co., 795 F.2d 775, 779-80 (9th Cir. 1986)*. That is not the circumstance here, where Plaintiff was employed and covered by the CBA at the time of the alleged wrongdoing.

*Gibson v. AT&T Technologies, Inc., 782 F.2d 686 (7th Cir. 1986)* presents a factual situation very similar to the present case, and I find it instructive. The plaintiffs in *Gibson* voluntarily left their jobs and agreed to accept benefits from an income protection program provided for by the collective bargaining agreement. *Id. at 687*. Several months after they resigned, AT&T laid off employees at plaintiffs' plant and provided them with severance pay. *Id*. The severance pay significantly exceeded the benefits under the income protection plan. [12] *Id. at 688*. Plaintiffs alleged that at the time of their resignation, AT&T wrongfully withheld information from them about plans to close the plant, and had they known of those plans, they would have continued working until the plant closed and their jobs were terminated. *Id*.

12  For example, one plaintiff's income protection benefit was $ 3,375, but his termination pay would have been over $ 54,000. *Gibson v. AT&T Technologies, Inc., 782 F.2d 686, 688 (7th Cir. 1986)*.

[*23]  The Seventh Circuit held that *§ 301* preempted plaintiffs' state law fraud claims. The court determined that the claims arose from the layoff benefits created by a collective bargaining agreement and, therefore, were controlled by federal law. *Id. at 688*. In rejecting plaintiffs' argument that the state has an interest in controlling and remedying allegedly fraudulent conduct, the court referred to the settled principles expressed in *Lueck* that allowing such a tort claim to proceed would thwart Congress' intention that federal law govern labor contract disputes. *Id. at 689*.

*Gibson* did not analyze in detail the relationship between the tort claim and the collective bargaining agreement, but the key factors are that the plaintiffs were covered by the collective bargaining agreement at the time the alleged deception occurred, and the dispute stemmed from the allegedly fraudulent deprivation of benefits deriving from that agreement.

Following the direction provided by *Gibson*, I agree with Defendant that whether Plaintiff was defrauded out of VTP benefits is an issue arising from and governed by the CBA, and thus, preempted by federal law.  [*24]

Case 1:07-cv-11384-JLT    Document 8    Filed 09/12/07    Page 20 of 23

Page 7

2006 U.S. Dist. LEXIS 43289, *; 153 Lab. Cas. (CCH) P10,708;
38 Employee Benefits Cas. (BNA) 2316

Article 25 creates the VTP program, and P 6 places restrictions on eligibility. Plaintiff herself in the grievance she filed on November 16, 2004, argued that Article 25, P 6(a) does not apply to her because she was "wantonly deceived" into retiring before the downsizing. The scope of P 6(a) must be determined by the grievance and arbitration process outlined in Article 9 of the CBA. Although Plaintiff's claim can also be recharacterized as the tort of misrepresentation, a decision from this court on that state-law claim would necessarily inform the meaning of Article 25, P 6 (a); and that is the precise situation that *Lueck* sought to channel exclusively into federal labor law.

Having established that Plaintiff's claims are preempted by federal law, I turn to the implications of that decision. Generally, employees who are union members and covered by a collective bargaining agreement must exhaust the remedies under that agreement before bringing suit under *§ 301. Vaca v. Sipes, 386 U.S. 171, 184, 87 S. Ct. 903, 17 L. Ed. 2d 842 (1967).* Exhaustion is not required where it would be futile, where the union breaches its duty of fair representation, or where union remedies are otherwise inadequate. [*25] *Id. at 184-85.* Defendant bears the burden of proving "not only the existence of an adequate intra-union remedy, but also [Plaintiff's] failure to pursue that remedy." *Doty v. Sewall, 908 F.2d 1053, 1061 (1st Cir. 1990).*

Article 9 of the CBA requires employees to file grievances within 60 days of the incident giving rise to the complaint. Plaintiff filed a grievance on December 9, 2004, more than 60 days after any conceivable relevant date, e.g., the alleged misrepresentations in June and July 2004; July 16, 2004, her last day of work before her final vacation; August 1, 2004, her retirement date; and September 13, 2004, the day of the downsizing announcement. For this reason, AT&T denied the grievance and the CWA twice rejected Plaintiff's appeals. Clearly, the CBA presented Plaintiff with a remedy; she, however, failed to pursue it within the permitted time period.

Plaintiff offers several arguments attempting to show that she had no remedy under the CBA. First, Plaintiff contends that she could not have brought her grievance in a timely fashion because she would have had to file it before September 13, 2004. It is not clear whether the 60-day [*26] time limitation is triggered on the day of the alleged wrongdoing or when Plaintiff first learned of the wrongdoing. [13] The issue of timeliness itself is a question of interpretation of the CBA through the CBA. Plaintiff never argued this point in her grievance or the subsequent appeal process.

13  Plaintiff has presented conflicting testimony as to when she actually learned of the downsizing. *See* note 7, *supra.* To the degree some sort of

discovery rule is implicated, however, that also is an interpretive matter for the grievance procedure.

Second, Plaintiff contends that the grievance procedure was not available to her. That is by no means undisputed and appears immaterial to the resolution of the grievance and the union's decision not to pursue it. AT&T's letter rejecting Plaintiff's grievance stated, in its entirety:

> The above mentioned grievance was filed beyond the 60-day timeline as per the Contract Article 9. Therefore, it will not be accepted by the company. Generally, grievances [*27] are also not accepted from retired employees, however, this also did not meet the agreed upon timeline.

Pl. Appendix at 42. This letter makes clear that the grievance was rejected for untimeliness. Plaintiff's retiree status was a secondary consideration. More importantly, the use of the modifier "generally" suggests that the grievance process was not completely foreclosed to retirees. [14]

14  Local 1051 President Linda Teoli told Plaintiff that AT&T rejected the grievance *inter alia* because "[g]rievances are not accepted from retired employees." Pl. Appendix at 43. This appears to overstate AT&T's reliance on a retiree ground to reject the grievance. For its part, the union, through Bill Bates and Frederick Cory, relied only on lack of timeliness in rejecting Plaintiff's appeals. *Id.* at 46, 48-49.

Finally, Plaintiff argues that her failure to exhaust was excusable. She claims that filing a grievance would have been futile because her November 16, 2004, grievance had been denied by AT&T and [*28] rejected twice by the union on appeal, and the union refused to take any more action on her behalf. Futility arises when grievance procedures are unsatisfactory or unworkable, such as where the "conduct of the employer amounts to a repudiation of the [collective bargaining agreement]" or when the union has wrongfully refused to process a grievance. *Vaca, 386 U.S. at 185.* AT&T and the CWA denied Plaintiff's grievance for untimeliness. This might be an unsatisfactory result for Plaintiff, but it does not render the grievance *process* futile. To the degree she remained dissatisfied, Plaintiff's remedy was to bring an action under *§ 301* against either or both the union or the employer. *See DelCostello v. Teamsters, 462 U.S. 151, 164-65, 103 S. Ct. 2281, 76 L. Ed. 2d 476 (1983)* (establish-

Case 1:07-cv-11384-JLT   Document 8   Filed 09/12/07   Page 21 of 23

Page 8

2006 U.S. Dist. LEXIS 43289, *; 153 Lab. Cas. (CCH) P10,708;
38 Employee Benefits Cas. (BNA) 2316

ing the right of an employee to bring a hybrid § 301/ fair representation claim). [15] This she has failed to do.

15 A hybrid suit combines two causes of action: (1) a claim against the employer under § 301 for breach of the collective bargaining agreement and (2) a claim against the union for breach of its duty of fair representation, which is implied under the National Labor Relations Act, 29 U.S.C. § 151. DelCostello v. Teamsters, 462 U.S. 151, 164-65, 103 S. Ct. 2281, 76 L. Ed. 2d 476 (1983). An employee may choose to sue one or both defendants, but she must prove both claims. Id. at 165.

[*29] Plaintiff filed this suit in state court on April 21, 2005. A § 301 hybrid claim may be brought in state court, Charles Dowd Box Co. v. Courtney, 368 U.S. 502, 505-514, 82 S. Ct. 519, 7 L. Ed. 2d 483 (1962), and Plaintiff's complaint would have been timely had it alleged a hybrid claim. The statute of limitations for a hybrid claim is six months from the date the employee "knew or reasonably should have known of the alleged wrongful acts." Adorno v. Crowley Towing and Transportation, 443 F.3d 122, 126 (1st Cir. 2006). Here, Plaintiff knew or should have known of AT&T's alleged breach of the CBA on September 13, 2004, or shortly thereafter, and the union's alleged breach of its duty of representation on February 14, 2005, the date of the CWA's final refusal to prosecute her appeal.

The reason for Plaintiff's failure to bring a proper § 301 claim is not the statute of limitations, but the nature of the claims themselves. In a supplemental filing timely submitted after the hearing on the motion, see note 9 supra, Plaintiff attempted to recharacterize her claims as a § 301 hybrid. The complaint, however, raised only two state law counts of misrepresentation, which I have [*30] held preempted by § 301. It made no allegations against the union for breach of the duty of fair representation. Because Plaintiff's complaint lacked this essential component, it could not be considered a hybrid claim. Nor has Plaintiff sought properly to amend her complaint.

In sum, there is no genuine dispute of material fact that the CBA grievance process offered a meaningful remedy to Plaintiff and she failed to avail herself of it in a timely fashion, either at the grievance level or through the mechanism for judicial review provided by a § 301 action.

I conclude that federal labor law preempts Plaintiff's claims and that the time period within which she may pursue her federal claims has passed without the Plaintiff having properly framed a § 301 case. Recognizing that this case has been argued to fall outside preemption, I will also address the merits of the claims as state law

matters as an alternative grounds for disposition. My disposition of these alternative grounds demonstrates the futility of Plaintiff's pursuit of a § 301 claim even were she permitted belatedly to raise it.

**B. Misrepresentation**

Plaintiff alleges in the alternative that AT&T misrepresented [*31] either intentionally or negligently its plans to downsize the Fairhaven facility. Because the two torts differ only in the scienter required, I discuss them together here. See Rodowicz v. Massachusetts Mutual Life Ins. Co., 279 F.3d 36, 42 (1st Cir. 2002).

In order to succeed on a claim for misrepresentation under Massachusetts law, the plaintiff must show "a false statement of material fact made to induce the plaintiff to act, together with reliance on the false statement by the plaintiff to the plaintiff's detriment." Rodowicz, 279 F.3d at 42. The speaker need not know that the statement is false if "the truth is reasonably susceptible of actual knowledge," or accurate facts are available to the speaker through "a modicum of diligence." Id. Massachusetts treats negligent misrepresentation claims "more as negligence actions than deceit actions, focusing on the degree of care exercised by the speaker in making the statement." Id.

Plaintiff alleges that Eustace and Cappuccio made false statements when they told her in June and July 2004 that AT&T had no plans to close or downsize the Fairhaven facility. Although Plaintiff has offered evidence [*32] to show that she relied on these statements to her detriment, she has not produced evidence sufficient for a jury to find that those statements were false when made.

In support of her argument, Plaintiff points out that between December 2003 and June 2004, AT&T sent notices to employees warning that the expiration of FCC regulations could lead to a cutback in its residential business. When the FCC regulations expired, AT&T announced that it was pulling out of the consumer business in seven states. Plaintiff contends that AT&T's 2003 Annual Report suggested that union jobs would be lost as a result of the expiration of the FCC regulations.

What connection, if any, the statements regarding the general state of AT&T's business in the first half of 2004 have to the downsizing in Fairhaven in September 2004 is unclear. Massachusetts was not one of the states in which AT&T announced cutbacks in residential service. Moreover, the notice announcing the residential pull-out emphasized that AT&T would continue to serve its existing residential customers in the affected states and that its enterprise, government, business, and DSL clients would not be affected. If anything can be inferred from [*33] this announcement with respect to AT&T's

2006 U.S. Dist. LEXIS 43289, *; 153 Lab. Cas. (CCH) P10,708;
38 Employee Benefits Cas. (BNA) 2316

workforce, it is that the number of employees in the affected states was unlikely to grow. It cannot reasonably be inferred that a downsizing in Fairhaven had been planned or even contemplated.

The 2003 Annual Report is similarly unhelpful in divining Fairhaven's future. To be sure, it reported the layoff of thousands of employees in 2002 and 2003 and anticipated further workforce reductions in 2004. However, of the approximately 6,800 employees terminated in 2002 and 2003, nearly 2/3 were management. [16] Moreover, the report provides no details about the terminated employees and no forecast of which business groups or geographic regions were targeted for further cutbacks. The Report does state that the majority of the employee terminations resulted from improved processes and automation in providing services for business customers, suggesting that future workforce reductions might occur in the area of business services, not the residential sector in which Plaintiff worked.

> 16  In a timely supplemental filing submitted after the hearing on this motion, see note 9, supra, Plaintiff offered a 2003 article from LookSmart.com that puts the number of employee terminations at 3,500, slightly over half of whom were management.

[*34] Plaintiff contends that Cappuccio was a director with regional responsibilities and, therefore, she should have known that AT&T's trend away from residential business signaled a downsizing for Fairhaven. In addition to making the unsupported connection between AT&T's national business trends and Fairhaven, this argument misreads the record. Cappuccio's responsibilities were local, not regional, [17] and Cappuccio's uncontroverted testimony is that she was not aware of Fairhaven's fate until three days before the September 13, 2004, announcement. [18]

> 17    Between approximately 1990 and 1995, Cappuccio held a position as region staff manager, supporting call centers in Massachusetts, Maine, New Hampshire, Vermont, Connecticut, and Rhode Island. She then switched her focus to training and development for that region. During the relevant time period, however, Cappuccio was the group manager for customer sales and services for the Fairhaven call center. Her job was national in the sense that Fairhaven received calls from all over the country, but her responsibilities were centered primarily on operations within the Fairhaven center.

[*35]

> 18    In a timely supplemental filing, see note 9 supra, Plaintiff produced documents that she be-

lieves indicated that AT&T outsourced to India the jobs that it had cut from the Fairhaven facility in 2004. She cites a paper from an Assistant Professor at the University of Massachusetts indicating that the union had obtained a January 2004 internal memo from an Indian consulting firm showing that the jobs would be moved to India. Stephanie Luce, "Capital Mobility and Job Loss in Massachusetts: A Look at Corporate Restructuring, Production Shifts, and Outsourcing," 7 (Apr. 28, 2005).

Assuming this paper and the internal memo could somehow overcome authentication and hearsay objections, they plainly fail to prove that Cappuccio or Eustace could have or should have known about the downsizing. There is no evidence to suggest that Cappuccio or Eustace were aware of or had access to the memo. Indeed, the precise contents of the memo, its author, its distribution list, and circulation are unknown. Thus, any inferences as to who was aware of it and what reference, if any, it made to Fairhaven downsizing are pure speculation.

[*36] Plaintiff also alleges that AT&T had a "past practice" of making decisions to close a facility several months in advance. In support, she points to two decisions to close similar facilities: one in September 1994 that was made in May of that year, and one in December 1997 that was made in the fall of that year. [19] Plaintiff has not shown how these decisions made five months and one to three months in advance, respectively, have any bearing on the veracity of Cappuccio's and Eustace's statements about Fairhaven in June and July 2004. [20]

> 19    Plaintiff raised the 1997 closing in her first post-hearing supplemental filing. See note 9 supra.

> 20    Plaintiff cites two cases for its "past practice" theory, neither of which provide support. See White v. Bell Atlantic Yellow Pages, 2004 U.S. Dist. LEXIS 4720, 2004 WL 594957 (D. Mass. March 23, 2004) (Woodlock, J.) (finding that even if defendant had a particular past practice, plaintiffs presented no evidence that the practice was intended for the future); Waterman Steamship Corp. v. 350 Bundles of Hardwood, 603 F. Supp. 490, 493 (D. Mass. 1984) (finding that a consignee's allegations regarding past practice of carrier in computing charges on net volume raised a genuine issue of material fact, precluding summary judgment on issue of estoppel by course of conduct).

[*37]  Plaintiff further argues that the decision in 2003 to sell the Fairhaven building and move into smaller quarters indicated in June and July 2004 that a downsizing was imminent. Cappuccio, however, testified that the decision to move to smaller quarters was unrelated to anticipated downsizing; the Fairhaven workforce had already shrunk from approximately 1000 to 430 and the company was experiencing difficulties with tenants. Indeed, Cappuccio had expected to discuss a plan to build out the Fairhaven facility with 430 employees on September 15, 2004. Plaintiff has offered no contrary evidence.

Finally, Plaintiff points to Eustace's deposition testimony in which she states that she "knew there was going to be an announcement of some kind." Eustace testified that she expected an announcement in September 2004, relating to reorganization in general. She knew that "they were reducing management levels," but had no further details. This testimony fails to establish that Eustace, Cappuccio, or anyone else at Fairhaven knew in June or July 2004, that Fairhaven would be downsizing in September of that year. Not only did Eustace state clearly that she believed the announcement concerned a general [*38]  reorganization with management reductions, but there is no evidence that she expected the announcement at the time she made the allegedly false statements. [21]

> [21]  After the deadline for post-hearing supplemental filings, Plaintiff submitted a second supplemental memorandum, *see* note 9 *supra*, in which she offered what appears to be transcripts from Local 1051's "information tape" that she claims refute Cappuccio's and Eustace's testimony that they did not know a downsizing announcement was going to be made in September 2004. Putting aside their belated submission, these documents raise concerns of authenticity, personal knowledge, and relevancy, and tend to support, not refute, Cappuccio's and Eustace's testimony. The speakers on the tapes are unidentified and the source of their knowledge is unknown. The statements regarding worker surpluses that Plaintiff points out refer to the year 2006, well beyond the events in question here. The tape that purports to be a transcript of a conversation with Local 1051 President Linda Teoli on July 22 (the year is not specified), mentions possible workforce reductions, but states that the impact on Fairhaven is unknown and "Joan Cappuccio has stated it is Business as Usual." In sum, these documents, even if admissible, lend no support to Plaintiff's case.

[*39]  In sum, Plaintiff has not produced evidence sufficient for a reasonable fact finder to conclude that the statements made by Eustance, Cappuccio, or any other AT&T manager regarding the downsizing of the Fairhaven facility in June and July 2004, were false when made. Thus, Plaintiff's claim of negligent misrepresentation cannot survive summary judgment. It follows that her claim for intentional misrepresentation, which requires a more substantial showing of scienter, also fails. [22]

> [22]  Plaintiff contends that Cappuccio could have inquired of other managers, such as John Polumbu, Director of the Consumer Division, as to whether AT&T had plans to downsize or close Fairhaven. Whether she could have made such inquiries is beside the point. The issue is whether a downsizing had been planned for September 2004, and if so, whether she should have known about it in June or July 2004. For the reasons discussed above, neither issue can be decided in Plaintiff's favor.

## IV. CONCLUSION

For the reasons set forth more [*40]  fully above, I GRANT Defendant's motion for summary judgment.

/s/ Douglas P. Woodlock

UNITED STATES DISTRICT JUDGE